UNITED STATES, to Use of JACKSON ORNAMENTAL IRON & BRONZE WORKS, v. BRENT et al.

UNITED STATES, to Use of CONKLING ARMSTRONG TERRA COTTA CO., v. SAME.

(District Court, W. D. South Carolina. August 8, 1916.)

1. PAYMENT ☞47(1)—APPLICATION—SUBSEQUENT TRANSFER OF CREDIT BY AGREEMENT OF PARTIES—RIGHTS OF SURETY.

Where a debtor makes a payment to a creditor to whom he owes two separate accounts, without directing its application, he thereby consents that the creditor may apply it to either account; and, when it is applied to one, a surety for such account is at once discharged from liability pro tanto, whether he had notice of the payment or not, and the credit cannot thereafter be transferred without his consent, although his principal and the creditor agree to the transfer.

[Ed. Note.—For other cases, see Payment, Cent. Dig. § 127; Dec. Dig ☞47(1).]

2. PRINCIPAL AND SURETY ☞57—SURETY COMPANIES—RIGHT OF ACTION AGAINST REINSURER.

Where a surety company transferred its business and good will to another company, which assumed all of its outstanding contracts and agreed to fulfill its obligations on its bonds the same as though they had been

issued by itself, a beneficiary of a bond issued by the former company may maintain an action on the contract against the reinsurer.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. § 101; Dec. Dig. ☞57.]

3. UNITED STATES ☞67(1)—CONTRACTOR'S BONDS—RIGHTS OF ASSIGNEE OF CLAIM.

An assignee of an account due for materials supplied to a subcontractor and used in the construction of a government building, through an assignment by the trustee in bankruptcy of the original creditor of all accounts with all securities whether legal or equitable, is entitled to the benefit of the bond given by the contractor pursuant to Act Aug. 13, 1894, c. 280, 28 Stat. 278, as amended by Act Feb. 24, 1905, c. 778, 33 Stat. 811 (Comp. St. 1913, § 6923).

[Ed. Note.—For other cases, see United States, Cent. Dig. § 50; Dec. Dig. ☞67(1).]

At Law. Action by the United States, for the use of the Jackson Ornamental Iron & Bronze Works, and by the United States, for the use of the Conkling Armstrong Terra Cotta Company, against W. J. Brent and others. On exceptions to master's report. Sustained in part, and overruled in part, with judgment for claimants.

Logan & Grace, of Charleston, S. C., for New York Central Iron Works Co.

Whaley, Barnwell & Grimball, of Charleston, S. C., for W. J. Brent Const. Co.

Smythe & Visanska, of Charleston, S. C., for National Surety Co.

Ansel & Harris, of Greenville, S. C., for Southwestern Surety Co.

JOHNSON, District Judge. This is an action brought on the bond of a contractor under the act of Congress of 1894, as amended by the act of February 24, 1905, to subject the principal and the surety to the payment of sums due to persons who furnished labor or materials in the construction of a public building at Gaffney, S. C., payment therefor not having been made. Proceedings were filed July 23, 1914, for the use of the Jackson Ornamental Iron & Bronze Works, claiming to be a party entitled to the benefit of the bond. There have been a number of interventions, setting up accounts for labor or materials and claiming the benefit of the bond. Some of these claims have been settled. There are left before the court for consideration two claims, namely: First, Jackson Ornamental Iron & Bronze Works; and, second, New York Central Iron Works Company, Incorporated.

The facts are as follows: W. J. Brent Construction Company made a contract with the United States for the erection of a public building, namely, a post office, in the town of Gaffney, in the Western district of South Carolina. On May 16, 1912, in order to secure the faithful performance of the contract, a bond was given by W. J. Brent Construction Company, with Empire State Surety Company as surety thereon. On October 16, 1912, the Treasury Department notified the contractor that the government had revoked the authority of Empire State Surety Company to sign bonds running to the United States and that other security must be given. On December 3, 1912, the

contractor gave another bond, in the sum of $23,000, with the South-western Surety Insurance Company as surety. This bond was made to cover all obligations theretofore or thereafter made in the erection of the Gaffney post office. On September 18, 1912, National Surety Company made a contract of reinsurance with the Empire State Insurance Company. By this contract, the National Surety Company agreed to repay the Empire State Insurance Company, its successors or assigns, any sums which said company might be liable to pay in consequence of default of the principals on certain bonds, including bond of the Brent Construction Company for the erection of the post office at Gaffney, S. C. On December 12, 1912, Empire State Insurance Company was placed in the hands of a receiver and its affairs liquidated, and it was finally dissolved September 23, 1913. W. J. Brent Construction Company also had a contract with the United States to erect a public building at Darlington, a town in the Eastern district of South Carolina. For the faithful performance of the Darlington contract, Brent Construction Company gave bond to the United States, with Fidelity Deposit Company as surety. Work on the post office at Darlington and work on the post office at Gaffney was going on at the same time. Jackson Ornamental Iron & Bronze Works furnished materials to Brent Construction Company for each of the buildings, and kept separate accounts on their books, charging to the Gaffney account materials furnished for the Gaffney post office, and charging to the Darlington account materials furnished for the Darlington post office. On July 8, 1913, W. J. Brent Construction Company remitted to Jackson Ornamental Iron & Bronze Works the sum of $250 in payment of its account. The construction company at that time was largely indebted to the Jackson Ornamental Iron & Bronze Works on both accounts. With the remittance the debtor gave no directions as to its application. Upon receiving it, the Jackson Ornamental Iron & Bronze Works applied it as a credit to the Gaffney account. Thereafter, on December 10, 1913, Jackson Ornamental Iron & Bronze Works received a statement from W. J. Brent Construction Company, by which it appeared that the construction company had placed the credit of the $250 on the Darlington job. Thereupon the Jackson Ornamental Iron & Bronze Works changed the credit on their books from the Gaffney account to the Darlington account, and wrote W. J. Brent Construction Company that they had already applied the money to the Gaffney account, but that in order that their books might correspond with those of the construction company, they had changed the credit from the Gaffney to the Darlington account. An action similar to this has been brought in the Eastern district for South Carolina against the contractor and the surety on the bond on account of the public building at Darlington. The contractor is bankrupt. Each surety claims the benefit of this $250 payment. The record shows that the special master in the Eastern district of South Carolina reports the credit should go to the Darlington account. The special master for the Western district of South Carolina reports that the credit should go to the Gaffney account. The only two questions in this claim before the court are: First, for what amount shall Jackson

Ornamental Iron & Bronze Works have judgment? Second, is the National Surety Company liable?

[1] The determination of the first question depends upon the application of the $250 payment. The debtor who pays his own money has the right to direct its application. If the debtor gives directions, his directions are controlling. If the debtor pays his creditor who has more than one claim and gives no directions as to the application, the creditor has the right to make the application, and whatever application the creditor makes is controlling. In neither case has the surety any control over the application. The decisions are not uniform in all the states as to the time within which the creditor may make the application. In South Carolina it is well settled that the creditor can exercise his right of application at any time before verdict or judgment. When payment has been made and applied, that completes the transaction. If payment is applied to a secured debt, the debt is extinguished pro tanto and to the extent of such payment the surety is discharged. Payment, once made and applied, cannot be recalled and otherwise applied without the consent of the surety. It is contended in this case that the surety knew nothing of this payment until long afterwards and that as the debtor and the creditor without any thought or suggestion of fraud practically agreed to the change in credit, it should stand. The answer to this contention is that the law does not require notice of partial payments or total payments to be given to the sureties. When a payment is made, it inures to the benefit of the surety whether he knows about it or not. It has been argued in this case that the change of credit from the Gaffney account to the Darlington account was tantamount to correcting a mistake, as the Brent Construction Company intended the payment to go to the Darlington account. There was no mistake. W. J. Brent Construction Company had a right to direct the application of the money. What W. J. Brent Construction Company may have intended to do is immaterial as it is an undisputed fact in this case that the W. J. Brent Construction Company did not direct the application of the payment. Failing to direct the application of the payment, the creditor had the right to make it and did make it. "As the tree falleth, so shall it lie." I stated above that while the doctrine in South Carolina allows the creditor until verdict or judgment to make his application, that does not, by any means, imply that he can change the application from time to time until verdict or judgment. I have not been able to find any authority which allowed an application once made to be changed. Of course a change could be made as between the debtor and creditor if no surety was involved, if they consented to it, or a change could be made where there is a surety, provided he consented. This in effect would be a new contract.. In United States Fidelity & Guaranty Company v. Eichel, 219 Fed. 803, 135 C. C. A. 473, the parties sought to change an application of payment and the court declined to allow it. In Columbia Digger Company v. Rector (D. C.) 215 Fed. 618, the court said:

"Rector and Daly had a right to make application of this payment and, in the manner indicated, have done so. This operated instanter to discharge the liability of the sureties pro tanto and, while plaintiff and Rector and Daly

might thereafter, as between themselves, change the application of such payment, it would not operate to revive the extinguished obligations of the defendants."

That court proceeded to say:

"It is true, as a general proposition, that a surety cannot direct the application of payments made by its principal, and is bound by any application made by the principal and creditor, or either of them."

In the case of the United States v. Massachusetts Bonding & Insurance Company (D. C.) 198 Fed. 923, on a contractor's bond where the rights of the surety company were involved, it was held that, the application of credits having been once made by the parties, there was no authority to make any other application thereof. It is contended in this case that the debtor and creditor agreed upon the application that was made in December to the Darlington account. Did the debtor and creditor not agree to the application of the credit to the Gaffney account in July? It seems to the court that that is the only legal effect, for Brent Construction Company sent a check for $250 to the Jackson Ornamental Iron & Bronze Works without any direction as to its application, which was tantamount to saying, "We agree to whatever application you make," and the moment the Jackson Ornamental Iron & Bronze Works applied the credit to the Gaffney account, the legal effect was, in no manner, different from what it would have been if there had been a long parley preceding the application. The court holds, therefore, as a matter of law that the application of the payment having been made by the creditor to the Gaffney account, the account was extinguished pro tanto, and the surety is entitled to the benefit of such payment.

[2] The next question relates to the liability of the National Surety Company. The case is not without difficulty. The weight of authority seems to be that there is no privity between the assured and the reinsurer, and that therefore the assured has no cause of action against the reinsurer. There are, however, some very strong cases upholding the contrary view. The case now under consideration is not an ordinary reinsurance contract. It is something more. It is the taking over of practically the entire business and good will of one insurance company by another as is manifest from the following language found in the contract:

"Whereas the Empire State Surety Company has heretofore issued and now has outstanding unexpired surety and fidelity bonds; * * * whereas the Empire State Surety Company wishes to relieve itself from any and all liability that may accrue under said unexpired bonds * * * and the National Surety Company is willing to assume such liability in the manner hereinafter stated; therefore this agreement witnesses: * * * The National Surety Company agrees to fulfill all the obligations of the Empire State Surety Company under the bonds * * * and agrees to adjust all claims arising as aforesaid under any of such bonds * * * at its own expense and to pay as aforesaid all valid claims arising under said bonds * * * in accordance with their terms and conditions occurring after August 22, 1912. The Empire State Surety Company hereby transfers to the National Surety Company all its rights, interests, powers, and privileges under all such bonds * * * so that the National Surety Company may act thereon in all respects as if it had itself issued such bonds * * * and said National Surety Company may

give any notices in relation to said bonds that the Empire State Surety Company could give, such notices to be given in its own name or in the name of the Empire State Surety Company or both; and all notices, proofs of loss, and other papers which the obligees in any of the said bonds shall have the right to give to the Empire State Surety Company may be given in like manner to the National Surety Company with like effect as if given to the Empire State Surety Company, it being the intention of this agreement that the National Surety Company shall take the place of the Empire State Surety Company as to all said unexpired bonds * * * in all respects with regard to all obligations therein, etc. * * * The Empire State Surety Company also sells, assigns, and transfers to the National. Surety Company all its good will and interest of every kind in the bonds herein reinsured; and also sells and transfers to the National Surety Company all its applications, indemnity agreements, collateral, and other like securities, schedules or statements, papers, records, books of records and accounts, and the covers containing the same of every kind relating to the bonds * * * hereby reinsured and further agrees to forthwith furnish to the National Surety Company a list of its agents and managers representing it, together with the transcripts of the agency contracts made with such agents. * * * The Empire State Surety Company further agrees with the National Surety Company that it may appoint as its agents all or any of the agents of the Empire State Surety Company with whom the National Surety Company may desire to negotiate."

The contract further provided that all losses should be adjusted and all litigation conducted by the National Surety Company at its own expense. Under circumstances of this kind it seems clear from the meager authority that I can find that the reinsurer assumes to the insured all the obligations of the original obligor. Under the subject of Reinsurance, in 24 American & English Encyclopedia of Law at page 258, it is said:

"The holder of an original policy of insurance acquires a right of action on a contract of reinsurance where the original insurer sells its business and good will to another company and the latter company in consideration thereof reinsures the risk of the first company and contracts to pay the losses under the first company's outstanding policies."

As authority for that statement the author refers to a number of decisions in Kansas, Wisconsin, New York, and California. It seems to me that this doctrine is sound.

Some question has been made about the National Surety Company not being properly made a party to this suit by the Jackson Ornamental Iron & Bronze Works. There were two actions, in one of which the surety company was made a party; and, as the statute limits the number of actions that can be brought to one, his honor, Judge Smith, consolidated the two actions. The National Surety Company is before the court, asserting its rights with great vigor and ability. The court certainly has jurisdiction of the subject-matter; the only purpose in serving the defendants would be to bring them into the court. I should be inclined to hold that, if the pleadings of the Jackson Ornamental Iron & Bronze Works are not sufficient to allow them to amend nunc pro tunc.

Wherefore it is ordered, adjudged, and decreed that the exceptions to the report of the standing master be overruled, and his report confirmed as to the claim of the Jackson Ornamental Iron & Bronze Works, and that the defendants do pay to the Jackson Ornamental

Iron & Bronze Works the sum of $537.96, with interest thereon at 7 per cent. from the 1st day of July, 1913.

[3] The branch of the case with reference to the claim of the New York Central Iron Works Company, Incorporated, comes up upon exceptions to the report of the standing master, and grows out of the construction of the post office building at Gaffney, S. C. W. J. Brent Construction Company, the contractors, contracted with Earle & Cook Company to furnish and install the boiler and certain attachments. Earle & Cook Company ordered the boiler and attachments from New York Central Iron Works. The latter company shipped the boiler and attachments to Earle & Cook Company, care W. J. Brent Construction Company, Gaffney, S. C. These articles were installed in the post office building, and were accepted by the government. Earle & Cook Company became bankrupt. New York Central Iron Works Company also became bankrupt, and the trustee in bankruptcy of said corporation sold to Odello D. McCardell, Daniel A. Stickel, and L. D. Perry, Creditors' Protective Committee, all the book accounts, trade lists and records, accounts and bills receivable, claims in equity, bankruptcy, and all other securities held in fee or in trust. This creditors' committee in turn sold and assigned all of the book accounts, rights, and equities of the New York Central Iron Works Company, to the New York Central Iron Works Company, Incorporated, the intervener here. The purchase price of the boiler and attachments was $399. It was shipped in August, 1912.

The questions arising from this state of facts are these: First, is the New York Central Iron Works Company, Incorporated, the intervener, the owner of the account due by Earle & Cook Company to the New York Central Iron Works Company? Second, is the intervener entitled to the benefit of the surety bonds required by the government under the acts of Congress for the protection of those who furnish materials and labor in public buildings?

In answer to the first question, the court finds as a fact that the intervener herein is the owner of a claim of $399 for material furnished in the construction of the United States post office at Gaffney, S. C., and that the material was furnished at the instance of Earle & Cook Company, a subcontractor, by the New York Central Iron Works Company and no part of the claim has been paid.

The court believes that the intervener is entitled to the benefit of the surety bond. In the case of Hill v. Surety Company, 200 U. S. 197, 26 Sup. Ct. 168, 50 L. Ed. 437, the court held that the statute was highly remedial, and should be given a liberal construction. In every case that has been before the court involving this statute, that same spirit has been manifested. The purpose of the enactment of the law was to insure payment for labor and materials entering into public buildings. The court in the Hill Case said:

The "language could hardly be plainer to evidence the intention of Congress to protect those whose labor or material has contributed to the prosecution of the work. There is no language in the statute, nor in the bond which is therein authorized, limiting the right of recovery to those who furnish material or labor directly to the contractor but all persons supplying the contractor

with labor or materials in the prosecution of the work provided for in the contract ought to be protected. The source of the labor or material is not indicated, or circumscribed. It is only required to be 'supplied' to the contractor in the prosecution of the work provided for. How supplied is not stated, and could only be known as the work advanced and the labor and material are furnished. If a construction is given to the bond so limiting the obligation incurred as to permit only those to recover who have contracted directly with the principal, it may happen that the material and labor which have contributed to the structure will not be paid for, owing to the default of subcontractors, and the manifest purpose of the statute to require compensation to those who have supplied such labor or material will be defeated. * * * It is easy for the contractor to see to it that he and his surety are secured against loss by requiring those with whom he deals to give security by bond, or otherwise, for the payment of such persons as furnished work or labor to go into the structure."

Our own Circuit Court of Appeals, speaking through Judge Pritchard, in construing this act of Congress, held:

"It was the manifest purpose of Congress in the enactment of this statute to protect the rights of parties performing labor as well as those supplying material for the construction of public buildings. Such being the case, this act should be interpreted so as to effectuate the intent of Congress by giving the same a liberal construction." Bankers' Surety Company v. Maxwell, 222 Fed. 797, 138 C. C. A. 345.

The master has held that the intervener has not brought himself within the terms of the act of Congress for the protection of those who furnish labor and materials for the construction of public buildings. There can be no doubt under the authorities about the right of the New York Central Iron Works Company which furnished the boiler to recover on the contractor's bond. The trustee succeeded to all the rights of the New York Central Iron Works Company. It surely would not be seriously contended that the trustee in succeeding to all the rights of the bankrupt could not avail himself of a security which the bankrupt had for the payment of a claim. Nor can it be doubted that when the trustee in bankruptcy sold the accounts with all securities, whether legal or equitable, the purchasers succeeded to all the rights of the trustee, and when the purchasers from the trustee in turn sold and assigned the accounts with all the rights and securities legal and equitable to the New York Central Iron Works Company, Incorporated, that company stood in the same plight as the original New York Central Iron Works Company which furnished the material that was used in the construction of the Gaffney post office. I know of no law that prevents the assignment of an account like this. Even if the assignment had not specifically provided that all securities, whether legal or equitable, should pass, it seems that the only logical position is that the security did pass with the account to the assignee. The assignor never held the bond. It was held in trust by the Secretary of the Treasury for the benefit of those who furnished labor and materials in the construction of the building. The purpose of the statute is to insure payment of accounts for labor and materials furnished the contractor in the erection of public buildings. The bond is in lieu of the security afforded in practically all the states by what is known as Mechanic's Lien Law. It has been repeatedly held that the ac-

counts for labor and materials under the Mechanic's Lien Law may be assigned, and that the assignee is entitled to all the benefits of the law.

I hold, therefore, that the intervener is the owner of the claim of the New York Central Iron Works Company, and is entitled to the benefit of the bond given by the contractor and deposited with the Secretary of the Treasury. Wherefore it is ordered, adjudged, and decreed that the report of the standing master of this court be overruled, and that the defendants do pay to the New York Central Iron Works Company, Incorporated, the sum of $399, with interest thereon from January 1, 1913, at 7 per cent., and, if this and the preceding claim be not paid by the defendants in 30 days, that the Jackson Ornamental Iron & Bronze Works and the New York Central Iron Works Company, Incorporated, each shall enter judgment and issue execution thereon.